IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


HENRY ALEXANDER HARMON                                    PETITIONER


v.                          NO. 4:20-cv-00697 KGB-PSH


DEXTER PAYNE                                              RESPONDENT



FINDINGS AND RECOMMENDATION


INSTRUCTIONS


The following proposed Recommendation has been sent to United States District Judge Kristine G. Baker. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

The record reflects that petitioner Henry Alexander Harmon ("Harmon") was charged in Pulaski County Circuit Court with multiple criminal offenses. Harmon was represented in the case by Robby Golden ("Golden"). Harmon was eventually convicted of one count of Murder in the First Degree, two counts of Aggravated Robbery, and one count of Aggravated Assault. He was also convicted of using a firearm during the commission of the offenses. Harmon appealed his convictions and, as his only claim, maintained that the state trial court erred by excluding evidence of third-party DNA on several pieces of evidence. The Arkansas Court of Appeals found no reversible error and affirmed his convictions. The Arkansas Supreme Court subsequently vacated the state Court of Appeals' decision and found that the state trial court had indeed erred by excluding the evidence. See Harmon v. State, 2014 Ark. 391, 441 S.W.3d 891 (2014). The state Supreme Court reversed the convictions and remanded the case to the state trial court.

Following the remand, Golden was relieved as Harmon's attorney of record. Attorneys Toney Brasuell ("Brasuell") and Bobby Digby ("Digby") were appointed to represent Harmon in the case.

Harmon was then tried a second time. On the second day of that trial, a mistrial was declared as a result of a problem involving a photographic line-up. A new trial was scheduled.

Before the third trial began in earnest, Harmon entered into a negotiated plea in which he pled guilty to Manslaughter and Robbery and was sentenced to consecutive five and forty year terms of imprisonment. Minutes after the sentence was imposed, his attorneys informed the state trial court that they had misinformed him about his parole eligibility. The state trial court reconvened, and Harmon was provided the correct information. He chose to accept the terms of the negotiated plea.

Harmon thereafter filed a petition for post-conviction relief pursuant to Arkansas Rule of Criminal Procedure 37 ("Rule 37"). In the petition, he raised three challenges to Brasuell and Digby's representation. The state trial court conducted an evidentiary hearing, at the outset of which Harmon asked to call, among others, Golden and Hugh Finkelstein ("Finkelstein"), the deputy prosecuting attorney who represented the State in Harmon's first trial. The request was denied. The state trial court eventually denied the petition, and Harmon appealed. The state Court of Appeals found no reversible error and affirmed the denial of the petition. See Harmon v. State, 2019 Ark.App. 492, 588 S.W.3d 432 (2019).

Harmon subsequently began the case at bar by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. 2254. He accompanied his petition with what appears to a brief, although it is captioned a habeas corpus petition pursuant to <u>Ark</u>. <u>Code</u> <u>Ann</u>. 16-112-101 through 123. Liberally construing the two submissions, he advanced the following seven claims:

1) The state trial court abused its discretion when Harmon was not allowed to question Finkelstein and Golden during the hearing held in connection with Harmon's Rule 37 petition.

2) Harmon's due process rights were violated when Finkelstein withheld the mental health records of Nikita Smith ("Smith"), who was with Harmon on the night of the murder.

3) Golden provided ineffective representation when he did not allow Harmon to review, verify, and sign or consent to the brief Golden filed on appeal following the first trial.

4) Brasuell and Digby provided ineffective representation when they failed to properly research, and advise Harmon about, the relevant sentencing guideline range and sentencing enhancements. As a part of the claim, Harmon appears to maintain that his sentence is not being properly calculated.

5) Brasuell and Digby provided ineffective representation when they failed to challenge DNA evidence, particularly with respect to Smith.

6) Brasuell and Digby provided ineffective representation when, prior to the third trial, they failed to challenge the expected testimony of Rahim Basir ("Basir"), who was with Harmon on the morning after the murder.

7) Harmon was placed in double jeopardy when he was sentenced for both manslaughter and robbery.

Respondent Dexter Payne ("Payne") filed a response to Harmon's petition. In the response, Payne maintained that Harmon's claims are procedurally defaulted, not cognizable in federal habeas review, or otherwise meritless under 28 U.S.C. 2254(d)'s deferential review.[1]

HARMON'S FIRST THREE CLAIMS. Harmon's first three claims are intertwined and will be treated jointly. He first maintains that the state trial court abused its discretion when he was not allowed to question Finkelstein and Golden during the Rule 37 hearing. Second, Harmon maintains that his due process rights were violated when Finkelstein

---

[1]    Harmon filed a reply to Payne's response. In the reply, Harmon re-argued the claims he set forth in his petition.

withheld Smith's mental health records. Third, Harmon maintains that Golden provided ineffective representation when he did not allow Harmon to review, verify, and sign or consent to the brief Golden filed on appeal following the first trial.

The record reflects that at the commencement of the Rule 37 hearing, Harmon asked to question Finkelstein and Golden. See Docket Entry 8 at CM/ECF 201-219. When Harmon was asked why, he explained that he wanted to question Finkelstein about his failure to disclose Smith's mental health records, records Harmon believed to be exculpatory or otherwise useful for impeachment purposes. Harmon asked to question Golden about his failure to allow Harmon to review, verify, sign, or otherwise consent to the brief Golden filed on appeal following the first trial. The State objected to the requests, noting that the requests had nothing to do with Harmon's guilty plea. With specific regard to whether Finkelstein withheld exculpatory evidence, or evidence capable of being used for impeachment purposes, the State noted that Smith's mental health records were not obtained by the State until well after the first trial had concluded and, once obtained, were immediately provided to Brasuell and Digby. The state trial court barred Harmon from questioning Finkelstein and Golden.

Harmon's first three claims were not set forth as claims for relief in his Rule 37 petition. <u>See</u> Docket Entry 8, Exhibit D at CM/ECF 64-70. He did, though, raise the claims in appealing the denial of his Rule 37 petition. The state Court of Appeals rejected the claims, finding the following:

> Harmon argues that the circuit court abused its discretion when it excused … Finkelstein, prosecutor, and … Golden, defense counsel, from testifying at the Rule 37 hearing. Harmon alleged that Finkelstein had committed a Brady violation by withholding the medical records of the State's witness in the two trials held before he negotiated a guilty plea. <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Harmon also claims that Golden violated his constitutional rights when acting as his trial counsel in the trial(s) before the negotiated plea deal. He contends that Golden filed a direct appeal without his consent or notification and that Golden failed to challenge the sufficiency of evidence to support the convictions.

> Harmon did not include his arguments regarding Finkelstein or Golden in his petition below. Rule 37.1(a) requires that all grounds for relief must be raised in the initial pleading. Also, claims against Finkelstein and Golden are not related to the guilty pleas; thus, these claims are not cognizable in a Rule 37 proceeding. <u>See</u> <u>Moss v. State</u>, 2010 Ark. 284, 2010 WL 2210933 (prosecutorial misconduct is not a claim cognizable in a Rule 37 proceeding); <u>Bryant v. State</u>, 323 Ark. 130, 913 S.W.2d 257 (1996) (when a defendant pleads guilty, the only claims cognizable in Rule 37 proceedings are those that allege the plea was not made voluntarily and intelligently or was entered without effective assistance of counsel).

<u>See</u> <u>Harmon v. State</u>, 588 S.W.3d at 437-438.

Although Harmon's first three claims are likely procedurally barred from federal court review, it is not necessary to enter the procedural bar morass. Instead, the undersigned notes that the state Court of Appeals rejected the claims, in part, because they are not related to his guilty plea. The state Court of Appeals' adjudication of the claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, nor did the adjudication result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. 2254(d). The adjudication of the claims is therefore accorded deference and is adopted.

Harmon's first three claims have nothing to do with his guilty plea. Collateral review in this instance is limited to determining whether he entered a voluntary, knowing, and intelligent guilty plea with competent counsel. See McMann v. Richardson, 397 U.S. 759 (1970). Harmon's claim that he was not allowed to question Finkelstein and Golden during the Rule 37 hearing has no bearing on the question of whether Harmon's guilty plea was valid. See Williams v. Missouri, 640 F.2d 140 (8th Cir. 1981) (defect in state post-conviction proceeding has no bearing on state conviction and does not provide cognizable constitutional issue for federal habeas review).

Likewise, Harmon's claims that Finkelstein withheld evidence during the first trial and Golden did not allow Harmon to review, verify, and sign or consent to the brief Golden filed on appeal have no bearing on the question of whether Harmon's guilty plea was valid. Once Harmon's first conviction was reversed and remanded, the conviction was "nullified and the slate wiped clean." See North Carolina v. Pearce, 395 U.S. 711, 721 (1969) (double jeopardy claim). It is not possible in this proceeding to review matters that were wiped clean by the reversal and remand of Harmon's first conviction.[2]

SENTENCING GUIDELINE RANGE AND SENTENCING ENHANCEMENTS. Harmon next maintains that his guilty plea should be set aside because Brasuell and Digby provided ineffective representation. Specifically, Harmon maintains that Brasuell and Digby failed to properly research, and advise Harmon about, the relevant sentencing guideline range and sentencing enhancements. As a part of the claim, Harmon appears to maintain that his sentence is not being properly calculated.

---

[2]   Although it is not clear how Smith's medical records are exculpatory evidence, they possibly could have been used for impeachment purposes. It might be a closer question were the records never disclosed to Brasuell and Digby, and Harmon allowed to plead guilty without the benefit of having reviewed the records. As Payne correctly notes, though, "[i]t is unchallenged that the prosecutor who subsequently handled the case (Amanda Fields) stated that the records were discovered by her in her attempt to locate … Smith, and, when [Fields] came into possession of the records, turned them over to defense counsel." See Docket Entry 8 at CM/ECF 19.

Before Harmon's third trial could begin in earnest, he entered into a negotiated plea. See Docket Entry 8, Exhibit D at CM/ECF 143-149. The terms of the plea were as follows: Count 1 was reduced from Murder in the First Degree to Manslaughter, Count 2 was reduced from Aggravated Robbery to Robbery, and Counts 3, 4, and 5 were dismissed, "as well as the firearm enhancement." See Docket Entry 8, Exhibit D at CM/ECF 143. The agreement evidencing the terms of the plea provided, in part, the following: "If your negotiated plea involves a sentence of imprisonment, do you state that no one has made you any promises regarding parole eligibility, earning of meritorious good time, early release, or anything of that nature in order to get you to enter this plea?" See Docket Entry 8, Exhibit C2 at CM/ECF 2. Harmon answered "yes" and initialed that portion of the agreement. The state trial court apprised Harmon of his rights and of the rights he would be waiving by pleading guilty. He was specifically asked whether he understood that he was being charged as a habitual offender. He said he understood, and the following exchange then occurred:

> MS. FIELDS [the deputy prosecuting attorney]: And he has been convicted of four or more felonies.
>
> THE COURT: Is he going to stipulate to the habitual status?

>    MR. BRASUELL: Yes.
>
>    THE COURT: All right. Mr. Harmon, did you hear those facts?
>
>    DEFENDANT: Yes, sir.

See Docket Entry 8, Exhibit D at CM/ECF 145. The state trial court then sentenced Harmon to consecutive five and forty year terms of imprisonment and gave him credit for 1,188 days of prior jail time.

Minutes after the sentence was imposed, Brasuell and Digby informed the state trial court that they had misinformed Harmon about his parole eligibility. The state trial court reconvened, and the following exchange then occurred:

>    THE COURT: Are you wanting to change your plea and have a trial or –
>
>    DEFENDANT: The plea still stands.
>
>    THE COURT: So you accept the plea?
>
>    DEFENDANT: Yes, sir.
>
>    MR. BRASUELL: It still stands. Judge, the sentence and parole eligibility, we—we misinformed Mr. Harmon, but we've re-advised him as to the correct parole eligibility and he understands and agrees to that, so. And we still backdated the jail credit to when he was arrested January 6th of 2012.

THE COURT: That's correct, and you'll get the same amount of days. It's not—

MR. BRASUELL: Right. Nothing—

THE COURT: It has not changed.

MR. BRASUELL: Nothing changes, really. It's jut the parole eligibility. We didn't advise him properly, but we have now; is that right.

DEFENDANT: Yes.

See Docket Entry 8, Exhibit D at CM/ECF 147-148.

Harmon raised the claim in his Rule 37 petition, and the claim was addressed at length during the Rule 37 hearing. See Docket Entry 8, Exhibit D at CM/ECF 262-270, 284-289, 291-300, 302-323, 325-326. The state trial court eventually denied the petition. Harmon appealed and raised the claim. The state Court of Appeals rejected the claim, finding the following:

> The State contends that the circuit court did not err by finding that counsel did not render ineffective assistance in relation to advising Harmon about his prospective prison sentence. We agree. The Arkansas Supreme Court has held that there is no constitutional requirement for defense counsel to inform the client about parole eligibility and that the failure to impart such information does not fall outside the range of competence demanded of attorneys in criminal cases. See Paige v. State, 2013 Ark. 432, 2013 WL 5883809. Also, the determination of parole eligibility is the province of the Arkansas Department of Correction. See Morris v. State, 333 Ark. 466, 970 S.W.2d 210 (1998).

> The circuit court found that Harmon failed to demonstrate that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. The circuit court relied on Digby's testimony that Harmon, after having been provided with the corrected parole information, elected to maintain his guilty plea. Credibility determinations are entitled to deference. See White v. State, 2013 Ark. 171, 426 S.W.3d 911. Additionally, the circuit court relied on Harmon's initialed assertion that he had not been made any promises regarding parole eligibility. Accordingly, Harmon failed to demonstrate that he would not have pled guilty but for counsel's alleged errors.

See Harmon v. State, 588 S.W.3d at 438–439.

Harmon's claim is governed by Strickland v. Washington, 466 U.S. 668, 689 (1984), which requires a two-part showing. First, the petitioner must show that his attorney's performance was deficient, i.e., counsel's representation fell below an objective standard of reasonableness. See Slocum v. Kelley, 854 F.3d 524 (8th Cir. 2017). Second, the petitioner must show prejudice. See Id. In the context of a guilty plea, he must show a reasonable probability that, but for his attorney's error, he would not have pleaded guilty but would have instead upon going to trial. See Hill v. Lockhart, 474 U.S. 52 (1985). Counsel is "strongly presumed" to have rendered adequate assistance, and the burden of showing that counsel's performance was deficient rests squarely on the petitioner. See Burt v. Titlow, 571 U.S. 12, 17 (2013).

Because Harmon's claim was addressed on the merits by the state Court of Appeals, his claim is also governed by 28 U.S.C. 2254(d) (inquiry into whether adjudication of claim by state court was contrary to, or involved an unreasonable application of, clearly established federal law, and whether adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented). Taken together with Strickland v. Washington, 28 U.S.C. 2254(d) establishes a "doubly deferential" standard of review. See Burt v. Titlow, 571 U.S. at 13 [quoting Cullen v. Pinholster, 563 U.S. 170, 202 (2011)] (when petitioner asks federal court to set aside sentence due to ineffective assistance of counsel during plea bargaining, federal court must use doubly deferential standard of review that gives state court and defense attorney the benefit of the doubt).

The state Court of Appeals' adjudication of Harmon's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, nor did the adjudication result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. The adjudication of the claim is therefore accorded deference and is adopted.

Brasuell and Digby did not render ineffective assistance in relation to advising Harmon about his prospective prison sentence. Harmon signed a plea agreement in which he acknowledged that no one had made any promises regarding parole eligibility, earning of meritorious good time, early release, or anything of such nature in order to get him to enter a guilty plea. He acknowledged in open court that he understood he was being charged as an habitual offender and, in fact, stipulated to be an habitual offender. After he was provided the correct parole eligibility information, he affirmed his desire to plead guilty.[3]

As a part of Harmon's claim, he appears to maintain that his sentence is not being properly calculated. The undersigned will not consider that portion of his claim for two reasons. First, it is outside the scope of this proceeding, which is limited to determining whether he entered a voluntary, knowing, and intelligent guilty plea with competent counsel. Second, the proper calculation of his sentence appears to the subject of an ongoing proceeding in Jefferson County Circuit Court. See Docket Entry 1 at CM/ECF 12; Docket Entry 8 at CM/ECF 23-24.

---

[3]    With regard to the parole eligibility issue, it is worth noting that erroneous advice about parole eligibility does not necessarily render a guilty plea involuntary as counsel is not required to provide such information. See Sims v. Payne, 2019 WL 5235303 (E.D.Ark. 2019) (Volpe, M.J.), report and recommendation adopted, 2019 WL 5212904 (E.D.Ark. 2019) (Wright, J.), appeal dismissed, 2020 WL 2036646 (8th Cir. 2020).

DNA EVIDENCE. Harmon makes a second challenge to Brasuell and Digby's representation. Harmon maintains that Brasuell and Digby failed to challenge DNA evidence, particularly with respect to Smith.

On direct appeal, the state Supreme Court found the following facts, all of which the undersigned adopts:

> [Christina] Dyer testified that, at around midnight on January 5, 2012, she and her fiance, [John] Williams, had just turned in for the night in their room at the Heritage House Motel when someone knocked on their door, kicked it in, and then ran into the room screaming, "Where's the money?" The assailant fired several shots as he entered the room, and Williams was fatally shot in the chest. The assailant proceeded to search the room for money, and Dyer managed to escape from the room as shots were being fired at her. Dyer hid behind a bush and saw the assailant leave the room and get into the driver's side of a vehicle that Dyer described as a brown, older model 4-door sedan similar to an El Dorado. When police officers began to follow a vehicle meeting that description, the driver led police on a high-speed chase. The officers eventually lost sight of the vehicle in the vicinity of Wright Avenue and Marshall Street; however, shortly afterward, police were notified that the vehicle had been abandoned in a parking lot at Arkansas Children's Hospital. The hood was still hot to the touch when police arrived, and several items of discarded clothing, including a jacket, a sweatshirt, a glove, and a bandana were found near the fence on the playground. A loaded pistol, later determined to be the murder weapon, was found in a pocket of the jacket, along with a receipt with Harmon's name on it. Surveillance video from the hospital that shows the vehicle pulling into the parking lot and a male and a female exiting the car and running toward the playground area near Marshall Street was admitted into evidence.

Although Dyer was unable to identify Harmon in a photo line-up, Nikita Smith testified that she was with Harmon on the night of January 5, 2012. Smith stated that she and Harmon had gotten high and then drove to the Heritage House to obtain more drugs. Smith stayed in the vehicle but stated that she saw Harmon, who was wearing blue jeans, a black hoodie, and a black coat, put a bandana on his head and approach one of the motel rooms. Smith then heard Harmon kick in the door, and several shots were fired. Smith next witnessed a woman run out of the room yelling for help, and Harmon returned to the vehicle carrying a pistol. When Smith asked Harmon what had happened, he stated that he had "shot that man." Harmon then fled from the scene and from police until he stopped the vehicle in the Children's Hospital parking lot. According to Smith, Harmon told her to run, and she saw him abandon several items of clothing and throw his gun over a gate. The two then split up and fled from the scene. Although Harmon warned Smith not to tell anyone what had happened, Smith told her cousin, who reported it to the police.

Jennifer Beatty, a forensic DNA examiner, testified that she had collected DNA samples from Harmon and the victim. She then tested the items of clothing that had been discarded near the hospital. Beatty stated that Williams's blood was found on the pistol, jacket, sweatshirt, glove, and bandana. In addition, Beatty testified that Harmon's blood was found on the sweatshirt and bandana. On cross-examination, Beatty further explained that there were major and minor contributors to the DNA found on the sweatshirt and the bandana.

See Harmon v. State, 441 S.W.3d at 892–893.

The claim was addressed during the Rule 37 hearing, see Docket Entry 8, Exhibit D at CM/ECF 233-239, and rejected by the state trial court. The state Court of Appeals rejected it as well, finding the following:

Harmon argues that trial counsel was ineffective for his failure to investigate and challenge DNA results with an outside expert, to subpoena, or to move to test Nakita Smith's DNA in order to prove a third-party-culpability defense. He also contends that Smith's medical records were withheld within the first trial, which was a Brady violation. He argues that counsel's failure to move to suppress Smith's testimony as not credible was unreasonable, and Harmon's contention is that his counsel failed to pursue a viable trial strategy.

Harmon's claim is not cognizable. To prevail on a claim of ineffective assistance of counsel for failure to investigate, the petitioner must allege some direct correlation between counsel's deficient performance and the decision to enter the plea. See Smith v. State, 2016 Ark. 401, 503 S.W.3d 783. Harmon does not argue that his counsel's action caused him to plead guilty. Further, Harmon cannot demonstrate deficient performance because his complaint is with counsel's trial strategy. Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for a finding of ineffective assistance of counsel. See Hickey v. State, 2013 Ark. 237, 428 S.W.3d 446. Brasuell testified that he requested additional evidence be tested for DNA with the crime lab, and he explained that he did not seek to force Smith to submit to a DNA test because he knew she is a felon and that her DNA was already in the database. Further, Smith had already admitted being in the vehicle when the shooting happened. Accordingly, the circuit court did not err by finding that Brasuell's actions were matters of trial strategy.

See Harmon v. State, 588 S.W.3d at 439.

Like Harmon's prior claim, this claim is governed by Strickland v. Washington and 28 U.S.C. 2254(d). Taken together, they establish a "doubly deferential" standard of review.

The state Court of Appeals' adjudication of Harmon's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, nor did the adjudication result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. The adjudication of the claim is therefore accorded deference and is adopted.

Brasuell and Digby did not render ineffective assistance with respect to the DNA evidence, particularly with respect to Smith's DNA. Brasuell requested that additional evidence be tested for DNA, and it was not necessary to request a DNA sample from Smith as a sample from her was in an available database. Moreover, Smith admitted to being with Harmon at the time of the murder and subsequent pursuit. In any event, Harmon has failed to show a reasonable probability that, but for their error, he would not have pleaded guilty but would have instead upon going to trial.

RAHIM BASIR. Harmon offers a third reason why Brasuell and Digby failed to provide constitutionally adequate representation. Although Harmon's claim is a bit confusing, it appears he maintains that Brasuell and Digby indicated an unwillingness during the run-up to the third trial to impeach Basir on his misidentification of Harmon.

On the night of the murder, Basir saw the police pursuing an automobile he recognized as belonging to Harmon. Sometime later, Basir bumped into Harmon, who asked Basir to help find Harmon's automobile and "some guns." See Docket Entry 8, Exhibit A2 at CM/ECF 35. Basir and Harmon found nothing, then spent the morning together. At some point, they were approached by police officers. Harmon spoke to the officers, insisted that he had done nothing wrong, then took off running.

Basir testified during the first trial. See Docket Entry 8, Exhibit A2 at CM/ECF 31-48. It is not clear whether he testified during the second trial. On the second day of that trial, a mistrial was declared as a result of a problem involving a photographic line-up. See Docket Entry 8, Exhibit D at CM/ECF 245-261. Although the precise problem is not abundantly clear, it appears that Harmon's photograph had been used in two line-ups: the first line-up in connection with the case at bar and the second line-up in connection with a robbery that had occurred some sixteen hours earlier. Apparently, Basir had picked Harmon out of one of the line-ups but failed to do so in another of the line-ups.

The claim was addressed during the Rule 37 hearing, see Docket Entry 8, Exhibit D at CM/ECF 245-261, and rejected by the state trial court. The state Court of Appeals also rejected the claim, finding the following:

> … Brasuell testified that it was not in his client's best interest
> to pursue a strategy that Bashir had identified the wrong person
> in a photograph lineup because it would have provided a
> backdoor for the State to introduce evidence that Bashir
> identified Harmon from a prior robbery earlier the same day as
> the shooting. It is not ineffective assistance of counsel to avoid
> eliciting testimony that would provide a backdoor to the
> admission of other bad acts by the defendant. See Rose v.
> State, 2017 Ark. App. 355, 526 S.W.3d 11. Thus, the circuit
> court's finding was not clearly erroneous.

See Harmon v. State, 588 S.W.3d at 439–440.

The state Court of Appeals' adjudication of Harmon's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, nor did the adjudication result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. The adjudication of the claim is therefore accorded deference and is adopted.

Brasuell and Digby did not render ineffective assistance because they indicated an unwillingness to impeach Basir on his misidentification of Harmon. Had Brasuell attempted to do so, the state Court of Appeals could find that the testimony would likely have given the State an opportunity to introduce evidence that Bashir identified Harmon in connection with an earlier robbery.

DOUBLE JEOPARDY. Harmon last maintains that he was placed in double jeopardy when he was sentenced for both manslaughter and robbery. It is his contention that he received multiple punishments for the same offense. He notes that in the "Victim Information, Multiple Victims" portion of the Judgment and Commitment Order, it was represented that there were not multiple victims. See Docket Entry 8, Exhibit D at CM/ECF 48, 49. Thus, he maintains, the State conceded that his conduct was a continuous, uninterrupted course of conduct as defined in Ark. Code Ann. 5-1-110(a)(5), and he could not be convicted of more than one offense.

The state Court of Appeals considered but rejected Harmon's claim. The court gave the following reason for doing so:

> Harmon argues that the circuit court abused its discretion for not granting relief based on protections provided by the Fifth Amendment—double jeopardy. Harmon argues that the double-jeopardy clause protects against multiple punishments for the same offense imposed in a single proceeding. See Hughes v. State, 347 Ark. 696, 66 S.W.3d 645 (2002). He contends that two consecutive sentences were imposed on him, when state law permitted only one. He claims that it is impermissible to be sentenced to separate punishments for manslaughter and the underlying felony of robbery, citing Arkansas Code Annotated section 5-1-110 (multiple-offense prosecutions). He also argues that the doctrine of merger prevents his being punished separately for manslaughter and robbery because the underlying robbery served as the predicate crime for manslaughter, and the crimes merged into one. …

> Harmon pled guilty to both manslaughter and robbery. The sentences were ordered to be served consecutively. This does not place him in double jeopardy. See White v. State, 2009 Ark. 225, 2009 WL 1098758. … We hold that the circuit court committed no error.

See Harmon v. State, 588 S.W.3d at 440.[4]

The state Court of Appeals' adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, nor did the adjudication result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. 2254(d). Although the court's rationale is a bit unclear, the adjudication is accorded deference and is adopted.

Here, Harmon was not convicted of more than one offense for the same conduct. He was convicted of more than one offense for different conduct, as Payne correctly notes the following:

> … For purposes of the negotiated plea agreement, the State sought a guilty-plea to the reduced charge of manslaughter—unspecified as to which subsection—and a single court of simple robbery—the original charges having alleged two victims, John Williams and Christina Dyer, as victims of an aggravated robbery. …

---

[4]     In White v. State, the Arkansas Supreme Court found that the imposition of consecutive sentences does not place a defendant in double jeopardy.

See Docket Entry 8 at CM/ECF 32. Thus, more than one victim was involved in this criminal escapade, notwithstanding the markings on the Judgment and Commitment Order.

Given the foregoing, Harmon's petition warrants no relief. The undersigned recommends that it be dismissed, all requested relief be denied, and judgment be entered for Payne.

DATED this 8th day of October, 2020.

 

_____

UNITED STATES MAGISTRATE JUDGE